UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Robert R. Glenn, on behalf of himself and all others similarly situated, | )<br>)<br>) |
| Plaintiff, | ) |
| v. | )<br>) |
| BP p.l.c., | )<br>) |
| Defendant. | )<br>) |

Civ. No.

**13 CV 8376**

CLASS ACTION COMPLAINT

DEMAND FOR JURY TRIAL

JUDGE FURMAN

Plaintiff Robert R. Glenn, on his own behalf and on behalf of all persons similarly situated, by his undersigned attorneys, makes the following allegations based upon personal knowledge as to himself and his own acts and upon information and belief as to all other matters, based upon, *inter alia*, the investigation of counsel:

## INTRODUCTION

1. This is a class action against BP p.l.c. ("BP" or the "Company") on behalf of all record holders of BP American Depositary Shares ("ADSs") as of May 7, 2010. The claims against BP are for assumpsit, money had and received, unjust enrichment, and breach of contract arising out of BP's failure to pay its shareholders a declared dividend of $.084 per ADS.

2. On April 27, 2010, BP announced that, as usual, its board of directors had declared a quarterly dividend for the first quarter of 2010 of $0.84 per ADS payable on June 21, 2010, to ADS shareholders of record as of May 7, 2010. Prior to 2010, BP had paid dividends on its ordinary shares in each year since 1917. Hundreds of thousands of shareholders, and millions more investors in mutual and pension funds, relied on the BP dividends as part of their

1

financial security and retirement income.  The total value of the dividends owing to the record date ADS shareholders was approximately $750 million.

3.      The declaration and announcement of the dividend created a binding obligation on the part of BP to pay the dividend on June 21, 2010, and created, in law, a debt owed by BP to the May 7, 2010 ADS shareholders.  In other words, on the record date ADS shareholders became creditors of BP for the dividend owed.

4.      The dividend was declared shortly after the explosion and fire that occurred in the Gulf of Mexico on April 20, 2010, on the Deepwater Horizon drilling rig operated by Transocean Holdings LLC.  On April 22, 2010, the rig sank, resulting in the unchecked flow of oil into the Gulf of Mexico from the Mississippi Canyon 252 exploration well (the "Macondo well"), in which BP held a majority interest.

5.      As weeks passed and the oil continued to flow unabated from the Macondo well, BP assured shareholders that the dividend would be paid and informed the market in general that its financial health was strong and its underlying business was very sound, despite the escalating costs and potential liabilities with respect to its oil spill response.  For example, BP, during a June 4, 2010, webcast declared: "The financial consequences of this [oil spill] will undoubtedly be severe, but BP faces its financial responsibilities as a strong company.  Outside this tragic incident, the company is performing well, as we saw with our first quarter results, and our asset base and balance sheet remain amongst the very best."

6.      BP's statement that it was a strong company was an understatement.  It is enormous; one of the largest companies in the world.  In 2010, it had revenues of $297 billion and total assets of more than $272 billion.

7.      Despite its enormous wealth and revenues making it capable of meeting all of its potential obligations, BP found itself under attack from politicians in the United States who did not like the look of BP paying a dividend to its shareholders, even though it was a debt BP was legally obligated to pay.  In a June 4, 2010, speech, President Obama stated: "Now, I don't have a problem with BP fulfilling its legal obligations … what I don't want to hear is, when they're spending that kind of money on their shareholders … that they're nickel-and-diming fishermen or small businesses here in the Gulf who are having a hard time."  At about the same time, on June 2, 2010, two U.S. Senators issued an open letter to BP urging the company to delay any dividend payment.  Over the next week, dozens of U.S. Representatives signed onto a similar letter to BP: "We urge you to halt your planned dividend payout and cancel your advertising campaign until you have done the hard work of capping the well, cleaning up the Gulf Coast and making whole those whose very livelihoods are threatened by this catastrophe. Not a moment before then should you return to business as usual."

8.      Despite having the financial ability and legal obligation to pay the dividend, BP chose political expediency over its obligations to the May 7 record date ADS shareholders.  On June 16, 2010, following a meeting with President Obama, BP announced that it had cancelled the previously declared first quarter dividend.  In the announcement, BP stated that it was cancelling the dividend despite its "strong financial position" and "deep asset base" and even though its business continued to operate "extremely well with strong underlying cash flows".

9.      BP did not pay the dividend on the June 21, 2010, payment date or at any other time.  By retaining the dividend, BP was unjustly enriched and breached its obligation to its shareholders to pay the declared dividend.

## JURISDICTION AND VENUE

10.     This Court has original jurisdiction of this action pursuant to 28 U.S.C. §
1332(d)(2), because the aggregate claims of the putative Class members exceed $5 million,
exclusive of interest and costs, and plaintiff is a citizen of Oregon and BP is a citizen of a foreign
state.

11.     This Court has personal jurisdiction over BP pursuant to Rule 4(k)(1)(a) of the
Federal Rules of Civil Procedure because BP is subject to the jurisdiction of the courts of general
jurisdiction in this district.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because BP is subject
to personal jurisdiction here and a substantial part of the events giving rise to the claims occurred
in this district.

## PARTIES

13.     Plaintiff Robert R. Glenn is a resident of the state of Oregon.

14.     Defendant BP is a public company limited by shares registered in and organized
and existing under the laws of England and Wales, with its global headquarters in London,
England.  BP is the largest oil and gas producer and one of the largest gasoline retailers in the
United States.  Its ADSs are listed and traded on the New York Stock Exchange ("NYSE").
Although BP is a global group operating or marketing its products in more than 80 countries, it is
a predominantly American company with more than 40 percent of its fixed assets and more than
25 percent of its employees located in the United States.  BP operates through its affiliates and
subsidiaries, and its designated agent in the United States is BP America Inc., a Delaware
corporation registered and authorized to conduct business in the state of New York.

## JURISDICTIONAL FACTS

## THE DEPOSIT AGREEMENT AND THE LISTING OF
## BP ADS SHARES ON THE NYSE

15.     BP ADSs were initially issued pursuant to a Deposit Agreement dated as of February 1, 1970, among BP, its ADS shareholders, and Morgan Guaranty Trust Company of New York.  The 1970 Deposit Agreement was superseded by an Amended and Restated Deposit Agreement dated as of December 31, 1998, among BP, its ADS shareholders, Amoco Corporation, and Morgan Guaranty Trust Company of New York.  The 1998 Deposit Agreement was superseded by an Amended and Restated Deposit Agreement dated as of August 1, 2007 (the "Deposit Agreement"), among BP, its ADS shareholders, and JPMorgan Chase Bank, N.A. ("JPMorgan"), as amended by an Amendment No. 1 to Deposit Agreement dated as of March 8, 2010.

16.     The Deposit Agreement provides the mechanism through which BP offers its foreign securities on an American stock exchange, thereby gaining a wider investor base through the U.S. market.

17.     Pursuant to the Deposit Agreement, BP ordinary shares are deposited with the "Depository," JPMorgan.  JPMorgan in turn issues American Depository Receipts (ADRs) for BP ADSs, each of which represents six BP ordinary shares on deposit with JPMorgan.

18.     BP ADSs are traded on the NYSE, which is located in New York.

19.     JPMorgan, the Depository, has its principal place of business in New York.  The Deposit Agreement lists JPMorgan's address as 4 New York Plaza, 13th Floor, New York, New York, 10004.

20.     The Deposit Agreement includes a New York choice-of-law provision.

21.     On information and belief, the Deposit Agreement was negotiated and/or executed in New York.

22.     The Deposit Agreement creates an ongoing business relationship between JPMorgan, the New York Depository, and BP.  Among other things, the Deposit Agreement contemplates that:

a.   BP will pay dividends on the deposited securities to the Depository, and that the Depository will then distribute the dividends to the ADS shareholders;

b.   BP will forward notices and reports regarding shareholder meetings to the Depository, which the Depository in turn forwards to ADS shareholders;

c.   BP will pay certain ongoing expenses of the Depository;

d.   the Depository and BP will consult on issues such as procedures for effectuating distributions, the fixing of record dates, and the form of proxy cards;

e.   the Depository will maintain records in keeping with procedures ordinarily followed by stock transfer agents located in the City of New York, the Depository will provide full electronic access to such records to BP, and the Depository will provide access to physical records during New York business hours;

f.   upon the request of BP, the Depository will make certain records available for inspection at an office in New York;

g.   BP will deliver to the Depository copies of governing documents and amendments thereto;

h.  in the event the Depository resigns or is removed, BP will use reasonable efforts to appoint a successor, which shall be a bank or trust company having an office in New York; and

i.  all notices to be given to the Depository will be sent to 4 New York Plaza, 13th Floor, New York, New York, 10004.

23.     BP in fact has engaged in substantial and ongoing contacts with the New York Depository as contemplated by the Deposit Agreement.

24.     BP operates a Scrip Dividend Program through which ADS holders may reinvest dividend payments in BP ADSs.  The Depository administers the Scrip Dividend Program on behalf of BP for ADS holders, and the Deposit Agreement contemplates that (when approved by BP) dividends may be distributed by the Depository in the form of ADRs (representing ADSs). Prior to the initiation of the Scrip Dividend Program in 2010, BP and the Depository operated a similar program through the BP Direct Access Plan.

25.     BP also has an ongoing business relationship with the NYSE, which is located in New York.  By virtue of its listing of ADSs on the NYSE, BP has an ongoing business relationship with the NYSE, is subject to NYSE rules, and has an ongoing obligation to make certain reports and to provide information to the NYSE.  On information and belief, BP entered into a listing agreement with the NYSE in order to allow its ADSs to be traded on the NYSE, and has engaged in substantial contacts with the NYSE relating to its ADSs.  Under NYSE rules, the Deposit Agreement was a required supplement to BP's basic NYSE listing agreement.

26.     Plaintiff Glenn and other putative class members purchased their BP ADSs through the NYSE.

27.     On information and belief, Plaintiff Glenn and putative class members received voting and other company information related to their BP ADSs through the New York Depository.

28.     On information and belief, Plaintiff Glenn and putative class members received dividend payments on their BP ADSs through the New York Depository.

29.     Approximately 38 percent of all BP shares are held in the U.S., more than any other nation.

30.     In 2010, the New York Depository held approximately 28 percent of all BP shares (which in turn were owned by the putative class members through ADSs).

**ADDITIONAL FACTS REGARDNG BP'S U.S. AND NEW YORK OPERATIONS**

31.     BP was incorporated as the "Anglo-Persian Oil Company, Limited" on April 14, 1909.  BP changed its name to "Anglo-Iranian Oil Company Limited" in 1935.  BP changed its name to "The British Petroleum Company Limited" in 1954.  BP changed its name to "BP Amoco p.l.c." in 1998.  BP changed its name to "BP p.l.c." in 2001.

32.     In 1965 BP organized BP North American Finance Corporation ("BPNAF") a Delaware corporation and a wholly-owned subsidiary of BP whose sole function was to serve as a vehicle through which BP and its other subsidiaries could access capital markets in the United States.  BPNAF issued 20-year promissory notes in the principal amount of $55,000,000 to institutional investors in the United States.  BPNAF loaned the proceeds to BP, and BP guaranteed the obligations of BPNAF under the notes.

33.     On January 23, 1970, the Morgan Guaranty Trust Company of New York filed a registration statement with the SEC seeking registration of BP ADSs, and BP ADS receipts listed

on the NYSE on March 23, 1970.  At the time, BP was one of only a handful of English

companies listed on the NYSE.

34.     During the 1970s, the British government and the Bank of England (collectively,

the "British Government") together owned as much as 68 percent of the outstanding ordinary

shares of BP, and the BP ADS receipts traded on the NYSE represented between approximately

2 percent and 8 percent of the outstanding ordinary shares of BP.  However, beginning in 1977

the British Government began a program of divesting its BP shareholdings, and by the end of

1981 the British Government owned less than 40 percent of BP's outstanding ordinary shares.

35.     In June 1983 BP and BPNAF registered another $500 million in guaranteed debt

securities to be issued by BPNAF and guaranteed by BP.

36.     In 1987, the British Government completed the divestiture of its remaining

interest in BP comprising approximately 31.5 percent of the outstanding shares of BP.

37.     1987 also marked an acknowledgement by BP that investors in the U.S.

represented a significant portion of its capital base.  In his Letter From the Chairman dated

February 19, 1987, included in BP's Annual Report and Accounts for 1986, Sir Peter Walters,

chairman of BP's board of directors, noted: "The number of BP shares held in the US and traded

in New York grew substantially in 1986 … I firmly believe that it is right that an international

company like BP should have a commensurately international capital base."  He also explained

that "Our emphasis on internationalizing BP extends well beyond the purely financial sphere."

38.     In May 1987 BP completed its acquisition of 100 percent of the shares of the

Standard Oil Company (Ohio) (BP had acquired a 25 percent interest in 1970 and a 55 percent

interest in 1978).  BP combined Standard Oil and BP's other North American operations under

BP America Inc., a wholly-owned subsidiary of BP.  Sir Peter Walters discussed the acquisition

9

in his Letter From the Chairman dated March 1, 1988, included in BP's Annual Report and

Accounts for 1987:

> Merging Standard into BP would, we believed, give us access to the full potential of the American market while opening up for Standard's operations and staff an international dimension they formerly lacked.  And so it has proved.
>
> As to what it means for your company, I would say first and foremost it gives us an immensely strong position in the world's biggest market.  Today about half of our fixed assets are in the USA. As a result, the group, which previously had a preponderance of its assets in Europe, is now much better balanced.
>
> ***
>
> The size and significance of our investment in the USA have already been covered in some detail.  It is interesting to note though that BP America, which combines the previously separate interests of Standard Oil and BP North America, is now the twelfth largest company in the USA.  Very much a giant in its own right.

By the end of 1987, BP America Inc. represented BP's largest overseas holding and the United

States provided BP with more than 52 percent of its total operating profit.

39.     In March 1988, BP and BP America Inc. registered $1.95 billion in guaranteed

debt securities to be issued by BP America Inc. and guaranteed by BP.

40.     In 1989 BP announced that it would in the future pay dividends on a quarterly

basis.  As explained in BP's Annual Report and Accounts for 1989, the change to quarterly

dividends was intended to "give greater cash flow benefits to shareholders and to encourage

wider acceptability of BP equity in North America."

41.     In March 1991, BP and BP America Inc. registered $2.5 billion in guaranteed debt

securities to be issued by BP America and guaranteed by BP.

42.     On December 31, 1998, BP merged with Amoco Corporation (formerly Standard

Oil Company (Indiana)), an Indiana corporation whose shares were listed on the NYSE.  As a

result of the merger Amoco Corporation became a wholly-owned subsidiary of BP America Inc. In connection with the merger Amoco Corporation changed its name to BP Amoco Corporation, and in 2001 BP Amoco Corporation changed its name to BP Corporation North America Inc.

43.    In 1999 BP also entered into an agreement to acquire Atlantic Richfield Company ("ARCO"), a Delaware corporation whose shares were listed on the NYSE.  On April 18, 2000, BP completed its acquisition of ARCO.  As a result of the acquisition ARCO became a wholly-owned subsidiary of BP America Inc.

44.    On February 15, 2002, BP organized BP Capital Markets America Inc. ("BPCMA"), a wholly-owned subsidiary of BP America Inc., whose sole function was to serve as a financing vehicle for BP and to issue debt securities on behalf of BP.  On February 18, 2002, BP organized BP Canada Finance Company ("BPCFC"), a wholly-owned subsidiary of BP America Inc., whose sole function also was to serve as a financing vehicle for BP and to issue debt securities on behalf of BP.  On February 22, 2002, BP, BPCMA, BPCFC, and two other wholly-owned subsidiaries of BP filed a shelf registration statement for up to $6 billion in guaranteed debt securities to be issued by BPCMA, BPCFC, and/or the other registrants, and guaranteed by BP.

45.    On November 3, 2003, BP, BPCMA, BPCFC, and two other wholly-owned subsidiaries of BP filed a shelf registration statement for up to $9.147 billion in guaranteed debt securities to be issued by BPCMA, BPCFC, and/or the other registrants, and guaranteed by BP.

46.    BP America Inc. is, and at all times was, the agent of BP acting on BP's behalf.

47.    At all relevant times, BP has held out and represented in its Annual Report that BP America Inc. is its agent in the U.S.

48.     The U.S. operations of BP America Inc. make up the largest single geographic segment of BP's global operations.  For example: (a) in 2010, the U.S. region accounted for nearly 35 percent of BP's operating revenues, more than 42 percent of BP's fixed assets, and more than 42 percent of BP's capital investments and acquisitions; (b) in 2009, the U.S. region accounted for more than 35 percent of BP's operating revenues, more than 40 percent of BP's fixed assets, and more than 48 percent of BP's capital investments and acquisitions; and (c) in 2008, the U.S. region accounted for more than 51 percent of BP's operating revenues, more than 41 percent of BP's fixed assets, and more than 52 percent of BP's capital investments and acquisitions.  As explained in a March 2011 speech given by Lamar McKay, Executive Vice President of BP and Chairman and President of BP America Inc., "There should be no doubt whatsoever of the importance of the US for BP, for now, for the future, for the long-term future."

49.     BP operates in the U.S. and New York through BP America Inc. and its other agents, including the following wholly-owned subsidiaries and agents of BP America Inc., each of which is actively registered and authorized to conduct business in the state of New York:

     a.  American Oil Company, a Delaware corporation having a principal place of business at 501 Westlake Park Blvd., Houston, TX 77079, registered and authorized to conduct business in New York since 1959;

     b.  Atlantic Richfield Company, a Delaware corporation having a principal place of business at 501 Westlake Park Blvd., registered and authorized to conduct business in New York since 1985;

     c.  BP America Chemicals Company, a Delaware corporation having a principal place of business at 501 Westlake Park Blvd., Houston, TX 77079, registered and authorized to conduct business in New York since 1986;

d.  BP Amoco Chemical Company, Inc., a Delaware corporation having a
principal place of business at 501 Westlake Park Blvd., Houston, TX 77079,
registered and authorized to conduct business in New York since 1955;

e.  BP Canada Energy Marketing Corp., a Delaware corporation having a
principal place of business at 4101 Winfield Rd., Warrenville, IL 60555,
registered and authorized to conduct business in New York since 1990;

f.  BP Corporation North America Inc., an Indiana corporation with its principal
place of business at 501 Westlake Park Blvd., Houston, TX 77079, registered
and authorized to conduct business in New York since 1987;

g.  BP Energy Company, a Delaware corporation having a principal place of
business at 501 Westlake Park Blvd., Houston, TX 77079, registered and
authorized to conduct business in New York since 1993;

h.  BP Gas and Power Company, a Delaware corporation having a principal place
of business at 4101 Winfield Rd., Warrenville, IL 60555, registered and
authorized to conduct business in New York since 1996;

i.  BP Lubricants USA Inc., a Delaware corporation having a principal place of
business at 1500 Valley Road, Wayne, NJ 07470, registered and authorized to
conduct business in New York since 2005;

j.  BP Pipelines (North America) Inc., a Maine corporation having a principal
place of business at 501 Westlake Park Blvd., Houston, TX 77079, registered
and authorized to conduct business in New York since 2012;

13

k.   BP Products North America Inc., a Maryland corporation having a principal place of business at 4101 Winfield Road, Warrenville, IL 60555, registered and authorized to conduct business in New York since 1933; and

l.   Remediation Management Services Company, a Delaware corporation having a principal place of business at 501 Westlake Park Blvd., Houston, TX 77079. registered and authorized to conduct business in New York since 2010.

50.   BP, directly and/or through its network of agents and subsidiaries, engages in its core business operations in New York and the United States.

51.   BP operates thousands of retail gas stations throughout the U.S., including hundreds of such stations in New York.  As stated in one BP report, "BP, the leading gas marketer in New York, fuels LaGuardia Airport and delivers natural gas in the south-eastern part of the state."  BP's U.S. operations represent over 50 percent of BP's global retail presence.

52.   Approximately 25 percent of BP's employees are located in the U.S., more than in any other country.  BP and/or its subsidiaries have employees located in New York.

53.   BP maintains legal counsel in New York.

54.   BP engages in substantial advertisement throughout the United States, including in New York, and has websites available for viewing in the United States and New York.

55.   BP's operations in New York and the U.S. are part of an integrated global group managed from BP's executive offices in London.  BP's global operations are organized under two broad business segments: "Exploration and Production" and "Refining and Marketing". According to BP's Annual Report for 2010, filed on March 2, 2011, the activities of the "Exploration and Production" segment include "oil and natural gas exploration, field development and production; midstream transportation, storage and processing; and the

14

marketing and trading of natural gas, including liquefied natural gas (LNG), together with power and natural gas liquids (NGLs)," and the activities of the "Refining and Marketing" segment include "the supply and trading, refining, manufacturing, marketing and transportation of crude oil, petroleum and petrochemicals products and related services."

56.     In its Annual Report for 2010, BP announced that it had decided to reorganize its "Exploration and Production" segment to create three separate divisions: "Exploration, Developments, and Production, integrated through a Strategy and Integration organization". BP explained that the Exploration division would be accountable "for renewing our resource base through access, exploration and appraisal," that the Developments division would be accountable "for the safe and compliant execution of wells (drilling and completions) and major projects, building on the centralized developments organization established in 2010", that the Production division would be accountable "for safe and compliant operations, including upstream production assets, midstream transportation and processing activities, and the development of our resource base," and that the Strategy and Integration organization would be accountable "for optimization and integration across the divisions, including delivery of support from finance, procurement and supply chain, human resources and information technology". BP further explained that the activities of the three new divisions would be "integrated on a regional basis by a regional president reporting to the Production division".

57.     At the end of 2010, BP had the following centralized global executive management structure:

> a.   BP's Chief Executive was the head of the BP executive management team and a member of the BP board of directors;

b.  BP's Chief Executive, Refining and Marketing, was "the chief executive of the BP Group's refining and marketing business and also holds regional responsibility for Europe, Southern Africa and Asia Pacific";

c.  BP's Executive Vice President, Exploration, was "accountable for the leadership of BP's access, exploration and resource appraisal activities and the long-term replacement of BP's resource base";

d.  BP's Executive Vice President – E&P Production was "[a]ccountable for safe and compliant E&P operations and stewardship of resources across all regions" as well as "[l]ocal government and stakeholder management, integration of all E&P activities at the regional level, technical excellence across Safety & Operational Risk and Subsurface, and a robust Operating Management System to ensure safety, quality and compliance of production activities";

e.  BP's Executive Vice President, Strategy & Integration, was "the accountable executive for BP's Alternative Energy businesses" and "also manage[d] all of BP's corporate activities in strategy and policy, internal communications, media, press, investor relations, economics and long-term research and technology";

f.  BP's Executive Vice President, Safety & Operational Risk, was "responsible for strengthening safety, operational risk management, and the systematic management of operations across the BP corporate group";

g.  BP's Chief Financial Officer had "group accountability for BP's integrated supply and trading activities" and was a member of the BP board of directors;

h.  BP's Executive Vice President, Chairman and President BP America Inc., was "BP's chief representative in the United States";

i.  BP's Executive Vice President, Development, was accountable for the group's "[d]rilling and completions and project activity in the upstream"; and

i.  BP's Group General Counsel had "[g]lobal responsibility for legal function, trademarks, patents & licensing, compliance".

58.  BP controls the operations of BP America Inc. and its other operating subsidiaries.

59.  BP imposes a BP Code of Conduct on "every employee and officer in every BP wholly owned entity, and in joint ventures (JVs) to the extent possible and reasonable given BP's level of participation."  The requirements of the BP Code of Conduct may be waived only with the prior approval of the BP's Group Ethics & Compliance Officer.  BP's Code of Conduct extends to and governs every level and facet of the operations of BP and its subsidiaries (including the operations of BP America Inc. and its subsidiaries), including workplace health and safety; drug and alcohol use; environmental compliance and objectives; workplace harassment, intimidation, retaliation, and discrimination; privacy and confidentiality; gifts and entertainment; conflicts of interest arising out of outside jobs or affiliations; compliance with competition, antitrust, and other applicable laws and regulations; complying with trade restrictions, export controls, and anti-boycott laws; preventing money laundering; working with suppliers; eliminating bribery and corruption; dealing with governments; engaging with local communities; communicating with investors, analysts, and the media; company and individual political activity; maintaining accurate and complete information, records, reporting and accounting; protecting and disposing of company assets; the use and protection of intellectual

property and other protected information; avoiding insider dealing; and the use and security of the company's electronic and digital systems.

60.     BP has also exercised its control by imposing centralized, top-down measures in response to the string of disasters suffered by BP America Inc. and its other wholly-owned operating subsidiaries during the past decade.  For example, in its Annual Report for 2010, BP described the additional centralized top-level oversight it had imposed at every level of its global operations as part of its response to the Deepwater Horizon disaster:

> Among the changes we have made following the Gulf of Mexico incident, we have redefined and strengthened the scope and accountabilities of the group function for safety and operations, creating an enhanced, independent Safety and Operational Risk (S&OR) function, to oversee and audit the company's operations around the world.  ***The function has its own expert staff embedded in BP's operating units, including exploration projects and refineries, with defined intervention rights with respect to BP's technical and operational activities. The function reports directly to the group chief executive*** and aims to provide assurance that BP's operations are carried out to common standards, and audits conformance to those standards.

(Emphasis added).

61.     BP's centralized and top-down response to the Deepwater Horizon incident was similar to BP's response to the 2005 Texas City Refinery fire and the resulting recommendations of the Baker Panel Report.  As explained in BP's Annual Report for 2006, filed on March 6, 2007:

> Throughout 2006, BP continued to respond to the 23 March 2005 incident at its Texas City refinery.  BP addressed a number of the factors that contributed to the incident … ***BP also implemented a number of actions relating to safety and operations, not only at US refineries but also at other facilities worldwide.***  These actions include a decision to increase spending to an average of $1.7 billion a year over the next four years to improve the integrity and reliability of US refining assets, the formation of a safety and operations function to focus on operations and process safety

18

> across the group, **the appointment of a new chairman and president of BP America Inc. and the creation of an advisory board to assist BP America Inc.'s management in monitoring and assessing BP's US operations** ….

(Emphases added).

      62.    In addition to the BP Code of Conduct, BP establishes the financial and operating standards and policies of BP America Inc. and BP's other wholly-owned subsidiaries.  BP provided the following explanation of some of these centralized policies and procedures in its Annual Report for 2010:

> Our group functions and regions support the work of our segments and businesses.  **The key objectives of the functions are to establish and monitor fit-for-purpose functional standards across the group**; to act as centres of deep functional expertise; to access significant leverage with third-party suppliers; and to establish and maintain capabilities among the functional staff employed within our operating businesses.  In addition, the head of each region provides the required cross-segment integration and co-ordination of group activities in a particular geographic area and represents BP to external parties.
>
> ***
>
> **Safety and operational risk**
>
> Safety and operational risk management requirements, encapsulated by our operating management system (OMS), **are set by a central, dedicated function, with periodic reviews by the board and executive committees**.  The operational delivery of these requirements is the responsibility of the businesses.
>
> As a result of the Gulf of Mexico incident, BP has redefined and strengthened the scope and accountabilities of the group function for safety and operations, creating a new independent function, Safety and Operational Risk (S&OR).  **We are deploying S&OR professionals … in all of BP's operations throughout 2011**.
>
> ***
>
> The head of S&OR is a member of **BP's most senior executive team** along with the heads of Refining and Marketing, and Exploration and Production.  **S&OR oversees and audits the company's**

*operations around the world*, assuring that all operations are carried out in line with the group's OMS.  While the business line continues to be accountable for operational delivery, *S&OR holds the authority to intervene* in safety and operational risk aspects of BP's technical and operational activities.

***

**Operating management system**

In 2008, we launched OMS, *our group-wide framework to drive a rigourous and systematic approach to safety, risk management, and operational integrity across the company*.  OMS integrates all requirements regarding health, safety, security, environment and operational reliability, as well as related issues such as maintenance, contractor relations and organizational learning, into a common system.

The principles and standards of OMS are supported by detailed company practices, as well as other technical guidance materials. *OMS mandates that certain standards, group-defined practices and group engineering technical practices be implemented company-wide*; these include, among others, the assessment, prioritization and management of risk; incident investigation; integrity management; and environmental and social requirements for major new projects.

***

OMS defines the process for BP business units to implement the system and continuously improve their operational performance in all areas, including safety.  *The embedding of a comprehensive management system such as OMS across a global company is a multi-year process.*

***

**Financial risk factors**

The group is exposed to a number of different financial risks arising from natural business exposures as well as its use of financial instruments ….

The group financial risk committee (GFRC) advises the group chief financial officer (CFO) who oversees the management of these risks. The GFRC is chaired by the CFO and consists of a group of senior managers including the group treasurer and the heads of the finance, tax and the integrated supply and trading functions … The committee provides assurance to the CFO and the group chief

> executive (GCE), and via the GCE to the board, that ***the group's*** *** financial risk-taking activity is governed by appropriate policies*** *** and procedures*** ….
>
> The group's trading activities in the oil, natural gas and power markets are managed within the integrated supply and trading function, while the activities in the financial markets are managed by the integrated supply and trading function, on behalf of the treasury function.  All derivative activity is carried out by specialist teams that have the appropriate skills, experience and supervision. ***These*** *** teams are subject to close financial and management control.***

(Emphases added).

63.     BP guarantees the finance debt of BP America Inc. and BP's other wholly-owned subsidiaries.

64.     BP generally presents the BP Group as a single, unitary enterprise made up of BP and all of its operating subsidiaries, associates, and joint ventures.

### BP'S ARTICLES OF ASSOCIATION AND DIVIDEND POLICY

65.     On April 14, 1909, BP adopted its initial Memorandum of Association and Articles of Association ("1909 Articles") under the Companies (Consolidation) Act 1908.  In the 1909 Articles, BP expressly opted out of the model default provisions contained in Table A of the First Schedule to the Companies (Consolidation) Act 1908.  With respect to the declaration and payment of dividends, the 1909 Articles included the following provisions, among others:

> 117.     The Company in General Meeting may declare a dividend to be paid to the Members according to their rights and interests in the profits, but no larger dividend shall be declared than is recommended by the Board.
>
> ***
>
> 120.     When in the opinion of the Board the position of the Company permits, interim dividends may be paid to the Members on account of the dividend for the then current year.
>
> ***

> 122.    All dividends and interest shall belong and be paid (subject to the Company's lien) to those Members who shall be on the register at the date at which such dividend shall be declared, or at the date on which such interest shall be payable respectively, notwithstanding any subsequent transfer or transmission of shares.

66.    In 1949 BP adopted new Articles of Association under the Companies Act 1948.

67.    On January 4, 1982, BP re-registered under the Companies Acts 1948 to 1980 as a public company limited by shares.

68.    On May 5, 1983, BP adopted new Articles of Association (the "1983 Articles") under the Companies Acts 1948 to 1981.  Under the 1983 Articles, BP expressly opted out of the model default provisions contained in Table A of the First Schedule to the Companies Act 1948, as amended.  With respect to the declaration and payment of dividends, the 1983 Articles included the following provisions, among others:

> 114.  The Company may by Ordinary Resolution declare dividends but no such dividend shall exceed the amount recommended by the Directors.

> 115.  If and so far as in the opinion of the Directors the profits of the Company justify such payments, the Directors may declare and pay the fixed dividends on any class of shares carrying a fixed dividend expressed to be payable on fixed dates on the half-yearly or other dates prescribed for the payment thereof and may also from time to time declare and pay interim dividends on shares of any class of such amounts and on such dates and in respect of such periods as they think fit.

> ***

> 126.  Notwithstanding any other provision of these presents the Company or the Directors may by resolution specify any date (the "record date") as the date at the close of business on which *persons registered as the holders of shares or other securities shall be entitled to receipt of any dividend [or] distribution* … and such record date may be on or at any time before the date on which the same is paid or made or … at any time after the same is recommended, resolved, declared or announced but without

> prejudice to the rights *inter se* in respect of the same of transferors and transferees of any such shares or other securities.

(Emphasis added).

69.     By authorizing BP's board of directors to designate a date other than the declaration date or payment date as the date on which dividend rights attach to the Company's securities, Article 126 reflected the requirements of SEC Rule 10b-17 and the NYSE rules on which Rule 10b-17 was based, and enabled BP's board of directors to comply with those requirements.  SEC Rule 10b-17 requires the issuer of any class of publicly traded securities to provide detailed notice with respect to any dividend action.  Among other things, the notice must specify (a) the declaration date, (b) the record date "for determining holders entitled to receive the dividend", (c) the payment date, and (d) the details of any condition which must be satisfied to enable payment of the dividend.  The NYSE Listing Company Manual requires that listing companies provide prompt notice with respect to any dividend action specifying (a) the declaration date, (b) the record date, (c) the payment date, and (d) the details of any condition which must be satisfied to enable payment of the dividend.  The NYSE Listing Company Manual further requires that the record date only occur after the date on which it is definitely determined that the dividend will be paid.

70.     Other provisions of the 1983 Articles also recognized the rights attaching to securities on the record date.  For example, Article 118 provided: "[I]f any shares or securities are purchased cum dividend or interest, such dividend or interest may at the discretion of the Directors be treated as revenue, and it shall not be obligatory to capitalize the same or any part thereof."

71.     On September 21, 1987, BP adopted amended Articles of Association (the "1987 Articles") under the Companies Act 1985 reflecting the British Government's sale of its

23

remaining interest in the Company.  Under the 1987 Articles, BP again expressly opted out of the

default rules and model provisions contained in Table A in the Companies (Tables A to F)

Regulations 1985.  With respect to the declaration and payment of dividends, the 1987 Articles

included the following provisions, among others:

> 114.  The Company may by Ordinary Resolution declare dividends
> but no such dividend shall exceed the amount recommended by the
> Directors.
>
> 115.  If and so far as in the opinion of the Directors the profits of the
> Company justify such payments, the Directors may declare and pay
> the fixed dividends on any class of shares carrying a fixed dividend
> expressed to be payable on fixed dates on the half-yearly or other
> dates prescribed for the payment thereof and may also from time to
> time declare and pay interim dividends on shares of any class of such
> amounts and on such dates and in respect of such periods as they
> think fit.
>
> ***
>
> 126.  Notwithstanding any other provision of these presents the
> Company or the Directors may by resolution specify any date (the
> "record date") as the date at the close of business (or such other time
> as the Directors may determine) on which *persons registered as the
> holders of shares or other securities shall be entitled to receipt of
> any dividend [or] distribution* … and such record date may be on or
> at any time before the date on which the same is paid or made or …
> at any time after the same is recommended, resolved, declared or
> announced but without prejudice to the rights *inter se* in respect of
> the same of transferors and transferees of any such shares or other
> securities.

(Emphasis added).

72.   In 1989 BP announced that it would in the future pay dividends on a quarterly

basis.  Prior to 1989, BP had paid dividends on a half-yearly basis: a mid-year interim dividend

and a final dividend recommended by the directors and approved by the Company at the annual

general meeting.  In 1989 BP also adopted amendments to its Article of Association authorizing

the board of directors to fix the exchange rate for dividend payments to ADS holders at the date of declaration rather than the date of payment.

73.    On April 26, 1990, BP amended Article 126 of its Articles of Association to read as follows:

> 126.  Notwithstanding any other provisions of these presents but subject always to the Statutes the Company or the Directors may by resolution specify any date (the "record date") as the date at the close of business (or such other time as the Directors may determine) on which *persons registered as the holders of shares or other securities shall be entitled to receipt of any dividend [or] distribution* … and such record date may be on or at any time before the date on which the same is paid or made or … at any time after the same is recommended, resolved, declared or announced but without prejudice to the rights *inter se* in respect of the same of transferors and transferees of any such shares or securities.

(Emphasis added).

74.    On April 18, 1991, BP amended Article 115 of its Articles of Association to read as follows:

> 115.  If and so far as in the opinion of the Directors the profits of the Company justify such payments, the Directors may declare and pay the fixed dividends on any class of shares carrying a fixed dividend expressed to be payable on fixed dates on the half-yearly or other dates prescribed for the payment thereof and may also from time to time pay interim dividends on shares of any class of such amounts and on such dates and in respect of such periods as they think fit.

75.    In connection with the Amoco merger, BP adopted amended Articles of Association (the "1998 Articles") under the Companies Act 1985.  Under the 1998 Articles, BP again expressly opted out of the default rules and model provisions contained in Table A in the Companies (Tables A to F) Regulations 1985, as amended.  With respect to the declaration and payment of dividends, the 1998 Articles included the following provisions, among others:

111.  (A)  The Company may by Ordinary Resolution declare dividends but no such dividend shall exceed the amount recommended by the Directors.

(B)  In the period to 31 December 2003, the Directors shall announce any dividends on Ordinary Shares in US dollars together with a sterling equivalent for any such dividend which shall be determined in accordance with Article 113(C) below.

(C)  Holders of Ordinary Shares shall be entitled to be paid dividends in sterling.

112.  If and so far as in the opinion of the Directors the profits of the Company justify such payments, the Directors may declare and pay the fixed dividends on any class of shares carrying a fixed dividend expressed to be payable on fixed dates on the half-yearly or other dates prescribed for the payment thereof and may also from time to time pay interim dividends on shares of any class of such amounts and on such dates and in respect of such periods as they think fit.

***

123.  Notwithstanding any other provision of these presents but subject always to the Statutes, the Company or the Directors may by resolution specify any date (the "record date") as the date at the close of business (or such other time as the Directors may determine) on which *persons registered as the holders of shares or other securities shall be entitled to receipt of any dividend [or] distribution* … and such record date may be on or at any time before the date on which the same is paid or made or … at any time after the same is recommended, resolved, declared or announced but without prejudice to the rights *inter se* in respect of the same of transferors and transferees of any such shares or other securities.

(Emphasis added).

76.    In connection with the Amoco merger, BP filed and distributed a prospectus that included, among other things, the following comparison of the rights of Amoco shareholder with respect to dividends before and after the merger:

**COMPARISON OF RIGHTS OF AMOCO SHAREHOLDERS AND BP AMOCO SHAREHOLDERS**

As a result of the Merger, Amoco Shareholders will receive BP Amoco ADSs, each of which represents six BP Amoco Ordinary

Shares of BP Amoco, a public limited company incorporated under the laws of England and Wales. The following is a summary of material differences between the rights of Amoco Shareholders and the rights of BP Amoco Shareholders arising from the differences between the corporate laws of Indiana and England, the governing instruments of the two companies, and as a result of certain LSE requirements….

\*\*\*

**Sources and Payment of Dividends**

Under Indiana Law, the payment of dividends is permitted if, after giving effect to such action, the corporation is able to pay its debts as they become due in the ordinary course of business and the corporation's total assets exceed its total liabilities plus the amount that would be needed for preferential rights upon dissolution. The board of directors may base its determination that these requirements have been met on the corporation's financial statements prepared on the basis of accounting practices and principles that are reasonable under the circumstances or on a fair valuation or other method that is reasonable under the circumstances.

Under English law, a company may pay dividends on its ordinary shares, subject to the prior rights of holders of its preferred shares, only out of its distributable profits (accumulated, realized profits less accumulated, realized losses) and not out of share capital, which includes share premiums (paid-in surplus). Amounts credited to the share premium account (representing the excess of the consideration for the issue of shares over the aggregate nominal amount of such shares) may not be paid out as cash dividends but may be used, among other things, to pay up unissued shares which may then be distributed to shareholders in proportion to their holdings. In addition, an English public company such as BP Amoco may make a distribution at any time only if, at that time, the amount of its net assets is not less than the aggregate of its called-up (*i.e.*, issued and paid-up) share capital and undistributable reserves. BP has historically paid four dividends per year. BP Amoco's Board will have the power under the BP Amoco Articles to pay dividends.

77. Nowhere in BP's prospectus for the Amoco merger did BP disclose a material change for Amoco shareholders with respect to the conditions applicable to the declaration and payment of dividends that would allow dividends to be cancelled and revoked at the absolute and complete discretion of BP's directors at any time before, on, or after the record date.

27

78.     In 2003 BP's shareholders approved new Articles of Association that, among other things, gave BP's directors the right to declare and pay ordinary dividends.  At the Annual General Meeting held on April 24, 2003, BP adopted new Articles of Association (the "2003 Articles") under the Companies Act 1985.  Under the 2003 Articles, BP again expressly opted out of the default rules and model provisions contained in Table A in the Companies (Tables A to F) Regulations 1985, as amended.  With respect to the declaration and payment of dividends, the 2003 Articles included the following provisions, among others:

> 129.  (A)  The Company may by ordinary resolution declare dividends but no such dividend shall exceed the amount recommended by the Directors.
>
> (B)  *The Directors may also from time to time declare and pay dividends on shares of any class of such amounts and on such dates and in respect of such periods as they think fit.*
>
> (C)  Dividends may be declared and paid in any currency or currencies that the Directors shall determine, provided that:
>
> (i)  the Directors shall announce a sterling equivalent for any dividend declared in another currency, which sterling equivalent shall be determined in accordance with Article 131(C); and
>
> (ii) holders of Ordinary Shares shall be entitled to be paid dividends in sterling.
>
> (D)  When declaring a dividend, the Company or the Directors may identify either generally or in relation to any particular group or groups of shareholders the funds from which it is proposed that the dividend will be paid.
>
> ***
>
> 130.  If and so far as in the opinion of the Directors the profits of the Company justify such payments, the Directors may declare and pay the fixed dividends on any class of shares carrying a fixed dividend expressed to be payable on fixed dates on the half-yearly or other dates prescribed for the payment thereof and may also from time to time pay interim dividends on shares of any class of such amounts and on such dates and in respect of such periods as they think fit.

\*\*\*

142.  Notwithstanding any other provision of these Articles but subject always to the Statutes, the Company or the Directors may by resolution specify any date ("record date") as the date at the close of business (or such other time as the Directors may determine) on which *persons registered as the holders of shares or other securities shall be entitled to receipt of any dividend [or] distribution* … and such record date may be on or at any time before the date on which the same is paid or made or … at any time after the same is recommended, resolved, declared or announced but without prejudice to the rights *inter se* in respect of the same of transferors and transferees of any such shares or other securities.

(Emphasis added).

79.   The Notice of the 2003 Annual General Meeting (the "Notice of 2003 AGM") prepared and distributed by BP's board of directors explained that some of the changes to the Company's Articles of Association were "clarifying amendments" intended merely "to clarify, consolidate or confirm the powers already in the possession of the company or its officers," and that "[n]one of these amendments or new provisions affects the rights currently held by shareholders."  Article 129 was not such a "clarifying amendment".  The Notice of 2003 AGM explained that Article 129 was a "substantive amendment" intended to broaden the directors' authority with respect to the declaration and payment of dividends:

**Notes to Resolution 10 – Articles of Association**

Authority is sought to adopt new Articles of Association.  Copies of the new Articles of Association and interlined copies of the current Articles are available on *www.bp.com*, and from the company secretary's office on request.

The current Articles of Association of the company were adopted in 1983 and have been amended on twelve occasions since that date as various corporate events have taken place or legislation passed.  Further amendments are necessary to implement recent legislation.  The opportunity has been taken to review the Articles of Association with a view to producing a set of Articles which follows a logical order, is easier to use and reflects modern practice.  The new Articles of Association are the product of that review.

29

The following changes, using the new Article numbers, are drawn to members' attention.

\*\*\*

**Substantive amendments**

\*\*\*

Dividends

In November 1998, the company took powers for a period of five years for the directors to announce and pay dividends in US dollars (subject to the right of ordinary shareholders to be paid in sterling). This power has been broadened to give the directors powers to declare and pay dividends in any currency provided that a sterling equivalent shall be announced and the right of holders of ordinary shares to be paid in sterling is preserved.  It is not the company's intention to change its current policy of paying dividends on ordinary shares in US dollars (Article 129).

80.     By authorizing BP's board of directors to designate a date other than the declaration date or payment date as the date on which dividend rights attach to the Company's securities, Article 142 of the 2003 Articles reflected the requirements of SEC Rule 10b-17 and the NYSE Listing Company Manual and enabled BP's board of directors to comply with those requirements.  Other provisions of the 2003 Articles also recognized the rights attaching to securities on the record date.  For example, Article 133 provided: "[I]f any shares or securities are purchased cum dividend or interest, such dividend or interest may at the discretion of the Directors be treated as revenue, and it shall not be obligatory to capitalize the same or any part thereof."

81.     At the Annual General Meeting held on April 17, 2008, BP adopted new Articles of Association (the "2008 Articles") under the Companies Act 1985, that preserved the directors' authority to declare ordinary dividends.  Under the 2008 Articles, BP again expressly opted out of the default rules and model provisions contained in Table A in the Companies (Tables A to F) Regulations 1985, as amended, as well as any model articles of association promulgated under

the Companies Act 2006.  With respect to the declaration and payment of dividends, the 2008

Articles included the following provisions, among others:

129   (A)  The Company may by ordinary resolution declare dividends but no such dividend shall exceed the amount recommended by the Directors

(B)  ***The Directors may also from time to time declare and pay dividends on shares of any class of such amounts and on such dates and in respect of such periods as they think fit***

(C)  Dividends may be declared and paid in any currency or currencies that the Directors shall determine, provided that:

(i)  the Directors shall announce a sterling equivalent for any dividend declared in another currency, which sterling equivalent shall be determined in accordance with Article 131(C), and

(ii) holders of Ordinary Shares shall be entitled to be paid dividends in sterling

(D)  When declaring a dividend, the Company or the Directors may identify either generally or in relation to any particular group or groups of shareholders the funds from which it is proposed that the dividend will be paid

***

130   If and so far as in the opinion of the Directors the profits of the Company justify such payments, the Directors may declare and pay the fixed dividends on any class of shares carrying a fixed dividend expressed to be payable on fixed dates on the half-yearly or other dates prescribed for the payment thereof and may also from time to time pay interim dividends on shares of any class of such amounts and on such dates and in respect of such periods as they think fit

***

142   Notwithstanding any other provision of these Articles but subject always to the Statutes, the Company or the Directors may by resolution specify any date ("record date") as the date at the close of business (or such other time as the Directors may determine) ***on which persons registered as the holders of shares or other securities shall be entitled to receipt of any dividend [or] distribution*** … and such record date may be on or at any time before the date on which the same is paid or made or … at any time after

31

the same is recommended, resolved, declared or announced but
without prejudice to the rights *inter se* in respect of the same of
transferors and transferees of any such shares or other securities.

(Emphasis added).

82.     At the Annual General Meeting held on April 15, 2010, BP adopted its current

Articles of Association under the Companies Act 2006.  Under BP's current Articles of

Association, BP's directors continue to have the authority to declare ordinary dividends.  BP also

again expressly opted out of the default rules and model provisions contained in Table A in the

Companies (Tables A to F) Regulations 1985, as amended.  With respect to the declaration and

payment of dividends, the BP's Articles of Association include the following provisions, among

others:

131   (A)  The Company may by ordinary resolution declare
dividends but no such dividend shall exceed the amount
recommended by the Directors

(B)  ***The Directors may also from time to time declare and
pay dividends on shares of any class of such amounts and on such
dates and in respect of such periods as they think fit***

(C)  Dividends may be declared and paid in any currency or
currencies that the Directors shall determine, provided that

(i)   the Directors shall announce a sterling equivalent for
any dividend declared in another currency and the date of the
intended announcement of such sterling equivalent shall be notified
by the Directors when the dividend is declared,

(ii)  the sterling equivalent for any dividend declared in
another currency shall be determined in accordance with Article
133(C), and

(iii)  holders of Ordinary Shares shall be entitled to be paid
dividends in sterling

(D)  When declaring a dividend, the Company or the Directors
may identify either generally or in relation to any particular group or

32

groups of shareholders the funds from which it is proposed that the dividend will be paid

\*\*\*

132   If and so far as in the opinion of the Directors the profits of the Company justify such payments, the Directors may declare and pay the fixed dividends on any class of shares carrying a fixed dividend expressed to be payable on fixed dates on the half-yearly or other dates prescribed for the payment thereof and may also from time to time pay interim dividends on shares of any class of such amounts and on such dates and in respect of such periods as they think fit

\*\*\*

143   Notwithstanding any other provision of these Articles but subject always to the Statutes, the Company or the Directors may by resolution specify any date ("record date") as the date at the close of business (or such other time as the Directors may determine) on which *persons registered as the holders of shares or other securities shall be entitled to receipt of any dividend [or] distribution* … and such record date may be on or at any time before the date on which the same is paid or made or … at any time after the same is recommended, resolved, declared or announced but without prejudice to the rights *inter se* in respect of the same of transferors and transferees of any such shares or other securities.

(Emphasis added).


## CLASS ACTION ALLEGATIONS

83.     Plaintiff brings this action on behalf of himself and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

84.     The proposed class is defined as:  All BP ADS shareholders of record as of May 7, 2010, i.e., all persons who would have been entitled to receive the BP dividend declared on BP ADSs on April 27, 2010 (the "Class").

85.     Excluded from the Class are BP and any individual, firm, trust, corporation, company, or other person related to or affiliated with BP.

86.     This action is properly maintainable as a class action.

87.     The members of the Class are so numerous that joinder of all members is impractical.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, as of December 31, 2009, there were more than 830,000 BP ADS shareholders, nearly all of whom held fewer than 10,000 BP ADSs.

88.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class members.  The common questions of law and fact include, inter alia, the following:

    a.   whether plaintiff and the other members of the Class are entitled to receive the unpaid dividend and the interest thereon;

    b.   whether BP, in equity and good conscience, is entitled to retain the unpaid dividend or any interest thereon;

    c.   whether it would be unjust to allow BP to retain the declared but unpaid dividend or any interest thereon;

    d.   whether BP breached its contractual obligation to the record date ADS shareholders by not paying the declared dividend when due.

89.     Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class, and plaintiff has the same interests as the other members of the Class.  Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

90.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of the individual Class members' claims are generally small relative to the complexity of the litigation, and due to the financial resources of BP, it is unlikely that the members of the Class could afford to seek legal redress individually for the claims alleged herein.

91.     Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court.  Individualized litigation would also create the potential for inconsistent or contradictory rulings.  By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

## COMMON FACTUAL ALLEGATIONS

92.     On April 27, 2010, BP announced that its board of directors, as usual, had declared a quarterly dividend for the first quarter of 2010 of $0.84 per ADS payable on June 21, 2010, to its ADS shareholders of record as of May 7, 2010.  The total value of the dividends was approximately $2.6 billion.

93.     Prior to 2010, BP had paid dividends on its ordinary shares in each year since 1917, and hundreds of thousands of BP shareholders, and millions of other investors in mutual funds and pension funds, relied on the BP dividend as part of their financial security and retirement income.

94.     BP's Articles of Association authorize the directors to declare dividends.  BP's directors gained that authority in 2003, when BP's shareholders approved new Articles of

Association that, among other things, gave BP's directors the right to declare and pay ordinary dividends. The directors' authority with respect to the declaration of dividends is set out in Article 131, which provides:

**Powers and rights in respect of dividends**

**131** (A) The Company may by ordinary resolution declare dividends but no such dividend shall exceed the amount recommended by the Directors

(B) ***The Directors may also from time to time declare and pay dividends on shares of any class of such amounts and on such dates and in respect of such periods as they think fit***

(C) Dividends may be declared and paid in any currency or currencies that the Directors shall determine, provided that

(i) the Directors shall announce a sterling equivalent for any dividend declared in another currency and the date of the intended announcement of such sterling equivalent shall be notified by the Directors when the dividend is declared,

(ii) the sterling equivalent for any dividend declared in another currency shall be determined in accordance with Article 133(C), and

(iii) holders of Ordinary Shares shall be entitled to be paid dividends in sterling

(Emphasis added).

95. Article 131(C) of BP's Articles of Association applies only with respect to dividends declared pursuant to Article 131(A) or Article 131(B). BP's directors were acting pursuant to the requirements set forth in Article 131(C) with respect to the 2010 first quarter dividend:

a. BP's directors declared the dividend in U.S. dollars, announcing that "The quarterly dividend, to be paid on 21 June 2010, is 14 cents per share ($0.84 per ADS), the same as a year ago." The authority to declare dividends in U.S.

dollars arises under Article 131(C), and no similar provision of BP's Articles
of Association applies with respect to any announcement of interim dividends.

b.  With the dividend, BP's directors noted the date of the intended
announcement of the sterling equivalent as required by Article 131(C)(i):
"The corresponding amount in sterling will be announced on 8 June 2010."

c.  On June 8, 2010, BP's directors announced the sterling equivalent for the
declared dividend as required by Article 131(C)(i): "[T]he amount of sterling
dividend payable in cash on 21 June 2010 will be: 9.5568 pence per share."

d.  BP's directors determined the sterling equivalent for the declared dividend in
accordance with Article 133(C) as required by Article 131(C)(ii); BP's
directors announced that "Sterling dividends payable in cash will be converted
from US dollars at an average of the market exchange rate over the four
dealing days from 2 June 2010 to 7 June 2010 (£1 = US$1.46492)."

96.     BP's directors also offered a scrip dividend alternative with respect to the 2010
first quarter dividend.  The directors' authority to offer a scrip dividend alternative was governed
by Article 142 of BP's Articles of Association.  Article 142(D) provides that such authority is
limited by the scope of the authorizing shareholder resolution: "The Directors may not allot Scrip
Shares unless so authorised by ordinary resolution. Such a resolution may give authority in
relation to particular dividends or may extend to all dividends declared or paid in the period
specified in the resolution…."

97.     BP's directors offered the scrip dividend alternative with respect to the 2010 first
quarter dividend pursuant to Article 142 of BP's Articles of Association and an authorizing
resolution approved by the shareholders at the Annual General Meeting held on April 15, 2010.

The shareholder resolution authorized BP's directors "to offer the holders of ordinary shares of the company … the right to elect (in whole or part), to receive new ordinary shares (credited as fully paid) instead of cash, in respect of any dividend as may be declared by the directors from time to time …."  (Emphasis added).

98.     The language of the shareholder resolution limiting the scrip dividend program to dividends declared by BP's directors is consistent with the provisions of Article 142.  For example, Article 142(F) provides that participants in BP's dividend reinvestment plan automatically enrolled in scrip dividend program with respect to each dividend payable during the time any such program may be in effect "*whether such dividend is declared before, at or after such time*", and Article 142(C)  provides that the scrip dividend is determined by reference to the cash amount of the dividend the shareholder "would have received by way of dividend *in the currency in which such dividend was declared*."  (Emphases added).

99.     By declaring an ordinary dividend pursuant to Article 131(B) rather than resolving to pay an interim dividend under Article 132, BP directors acted in a manner consistent with their obligations with respect to the declaration and payment of dividends.  Although under BP's Articles of Association, either the shareholders or BP's directors may declare dividends, BP's directors did not refer the matter of dividends to BP's shareholders.  Accordingly, the ongoing payment of interim dividends by BP's directors without any declaration of dividends by the directors or the Company would have been inconsistent with English law concerning the payment of interim dividends. *See Revenue & Customs Comm'rs v. Holland* [2011] Bus.L.R. 111, 148 ("[F]or a company to pay an endless stream of interim dividends, with no final dividend ever recommended by the directors and approved by the company in general meeting, could not

be a proper exercise of the powers conferred by the [company's articles].") (L. Walker, dissenting).

100.    By declaring an ordinary dividend pursuant to Article 131(B) rather than resolving to pay an interim dividend under Article 132, BP directors also ensured that BP complied with the dividend notice requirements under SEC Rule 10b-17 and the NYSE Listing Company Manual § 204.12, which require, among other things, a disclosure describing the details of any condition which must be satisfied to enable payment of the dividend.  Since 1970, when BP ADSs first listed on the NYSE, no BP dividend announcement has described any condition which must be satisfied to enable payment of a dividend (other than the approval of a final dividend by shareholders), and no annual or quarterly report issued by BP has described any condition which must be satisfied to enable payment of an announced dividend (other than the approval of a final dividend by shareholders).

101.    BP's directors have authority to specify a record date with respect to any dividend pursuant to Article 143 of BP's Articles of Association, which provides that "[n]otwithstanding any other provision of these Articles … the Directors may by resolution specify any date ("record date") as the date … on which persons registered as the holders of shares or other securities *shall be entitled to receipt of any dividend* …."  (Emphasis added).  Article 143 is an exchange-oriented provision that allows BP's directors to fix BP's obligations with respect to dividends as of a specified record date.  Because a specified record date fixing shareholders' entitlement to dividends is necessary to the proper functioning of the securities markets, Sections 204.12 and 703.02(b) of the NYSE Listing Company Manual require that listed companies specify a record date for any announced dividend and that the record date only occur after the date on which it is definitely determined that the dividend will be paid.

102.    Consistent with market requirements, BP's directors exercised their authority under Article 143 and specified a record date of May 7, 2010, for the 2010 first quarter dividend: "The dividend is payable on 21 June 2010 to shareholders and ADS holders on the register on 7 May 2010." Accordingly, whether they were acting under Article 131(B) or Article 132, the right to the 2010 first quarter dividend attached to BP's ADS shares on May 7, 2010, the record date chosen by the directors.

103.    Because, under the applicable law and BP's Articles of Association, BP's directors were authorized and permitted to declare and pay the first quarter dividend, and the declaration of the quarterly dividend by the directors complied with all applicable requirements of the applicable law and BP's Articles of Association, the declaration of the first quarter dividend and record date created a binding obligation on the part of BP to pay the declared dividend on June 21, 2010.

104.    Shortly before the dividend was declared an explosion and fire occurred in the Gulf of Mexico on April 20, 2010, on the Deepwater Horizon drilling rig operated by Transocean Holdings LLC, and on April 22, 2010, the Deepwater Horizon drilling rig sank, resulting in oil flowing unchecked into the Gulf of Mexico from the Macondo well, in which BP held a majority interest.

105.    Although the oil spill was a huge disaster, BP's financial position was so strong, and the company's business was performing so well, its financial ability to pay for the oil spill clean-up, as well as paying the dividend to its shareholders was never in question.

106.    BP is an enormous company; one of the largest in the world. In 2010, it had revenues of $297 billion and total assets of more than $272 billion.

107.    Plaintiff was a BP ADS shareholder of record on May 7, 2010.  As a result, he became a creditor of BP and was entitled to receive a dividend in the amount of $0.84 per ADS share on June 21, 2010.

108.    BP's actions after the declaration of the dividend showed it had the financial ability and intent to satisfy its legal obligation to pay the dividend.  For example, on May 10, 2010, pursuant to the requirements of its Articles of Association, BP announced the reference share price for its scrip dividend program, which meant that BP intended to pay the dividend on June 21, 2011.

109.    Then on June 8, 2010, pursuant to the requirements of its Articles of Association, BP announced the amount of the Sterling dividend on its ordinary shares.  In connection with that announcement, BP reiterated the dividend on its ADS shares: "As previously announced, the dividend payable to holders of American Depositary Shares ('ADSs'), each of which represents six ordinary shares, will be US$0.84 per ADS.  The dividend will be paid to holders of ADSs in cash in US dollars."

110.    In fact, BP assured its shareholders that it would and had the financial ability to pay the dividend it was legally obligated to pay.  During a June 4, 2010, webcast to its shareholders, BP committed to "meet [its] obligations to [its] … hundreds of thousands of shareholders, and millions more in mutual and pension funds, who rely on their investment in BP as part of their financial security and in many cases their retirement income."  BP emphasized its strong financial position, stating: "The financial consequences of this [oil spill] will undoubtedly be severe, but BP faces its financial responsibilities as a strong company.  Outside this tragic incident, the company is performing well, as we saw with our first quarter results, and our asset base and balance sheet remain amongst the very best."  BP further stated: "Under the current

trading environment, we are generating significant additional cash flow.  In addition, our gearing is currently below the bottom of our targeted range.  And our asset base is strong and valuable, with more than 18bn barrels of proven reserves and 63bn barrels of resources at the end of 2009. All of the above gives us significant flexibility in dealing with the cost of the incident."

111.    However, paying the dividend then became a political tug of war.  In a speech later the same day, June 4, 2010, President Obama criticized BP's expressed intention to meet its legal obligations to its shareholders:

> "[T]here are reports that BP will be paying $10.5 billion – that's billion with a B – in dividend payments this quarter.
>
> Now, I don't have a problem with BP fulfilling its legal obligations. But I want BP to be very clear, they've got moral and legal obligations here in the Gulf for the damage that has been done.  And what I don't want to hear is, when they're spending that kind of money on their shareholders … that they're nickel-and-diming fishermen or small businesses here in the Gulf who are having a hard time.
>
> ***
>
> And the fact that BP can pay a $10.5 billion dividend payment is indicative of how much money these folks have been making.  And given the fact that they didn't fully account for the risks, I don't want somebody else bearing the costs of those risks that they took.  I want to make sure that they're paying for it.
>
> ***
>
> I want to make sure that they are paying the folks in Louisiana for the havoc that they wreaked, and the folks in Alabama and the folks in Florida.  I don't want them nickel-and-diming people down here.  I want them to abide by their obligations to their shareholders; I want them to abide by the obligations to people down here, as well."

112.     At about the same time, on June 2, 2010, two U.S. Senators sent a letter to BP urging BP to suspend its dividend and issued a related press release suggesting that any decision by BP to go forward with its dividend would invite scrutiny by the U.S. Justice Department.

113.    Over the next week, dozens of U.S. Representatives signed onto a similar letter to BP: "We urge you to halt your planned dividend payout and cancel your advertising campaign until you have done the hard work of capping the well, cleaning up the Gulf Coast and making whole those whose very livelihoods are threatened by this catastrophe. Not a moment before then should you return to business as usual."

114.    Throughout this time period, despite the political statements, BP continued to make assurances that it had the financial strength to meet all its obligations, including to pay the declared dividend that was owed.   For example, on June 10, 2010, in response to the substantial decline in its share price, BP again emphasized its strong financial position, stating:

> "BP notes the fall in its share price in US trading last night.  The company is not aware of any reason which justifies this share price movement.
>
> BP continues to keep the market updated on the Gulf of Mexico oil spill through regular announcements.  The response to this incident is our top priority.
>
> BP faces this situation as a strong company.  In March, we indicated that the company's cash inflows and outflows were balanced at an oil price of around $60/barrel.  This was before the costs of the incident.
>
> Under the current trading environment, we are generating significant additional cash flow.  In addition, our gearing is currently below the bottom of our targeted range.  Our asset base is strong and valuable, with more than 18bn barrels of proved reserves and 63bn barrels of resources as at the end of 2009.  All of the above gives us significant capacity and flexibility in dealing with the cost of responding to the incident, the environmental remediation and the payment of legitimate claims."

115.    However, on June 16, 2010, following a meeting with President Obama, BP announced that its board of directors had cancelled the "***previously declared first quarter dividend***".  (Emphasis added).  BP emphasized that it was taking the actions "in spite of [its]

43

strong financial position and the deep asset base" and "[e]ven though [its] business continues to operate extremely well with strong underlying cash flows."  This announcement makes clear that BP's directors were purporting to cancel a declared dividend and that BP's directors understood that they had declared the 2010 first quarter dividend pursuant to their authority to declare dividends under Article 131(B).

116.    BP also announced that it was setting up a $20 billion claims fund that would be funded over time.  The announcement read:

> "We have agreed to create a $20 billion claims fund which we'd be paying into over the next three and a half years. The payments into the fund would be made on a basis of $3 billion in the third quarter, $2 billion in the fourth quarter and then $1.25 billion per quarter across the subsequent three years.  While that fund is building, we're going to underpin our commitments by setting aside some US assets with a value of $20 billion, and the intention is that these assets will be secured against the obligation but that level of assets will then decline as cash contributions are made into the fund.  The fund will be available to satisfy legitimate claims, including natural-resources damages and state and local response costs."

117.    On July 12, 2010, BP announced that it had completed the installation of a new sealing cap on the Macondo well, effectively stopping the flow of oil into the Gulf of Mexico, and on August 4, 2010, BP announced that it had succeeded in gaining control of the Macondo well through application of a static kill procedure, which was completed by the application of a cement plug on August 5, 2010.

118.    Given the enormous financial wealth of BP, and the strength of its underlying business, setting up the $20 billion fund and paying the other costs related to the oil spill did not impair BP's financial ability to pay the dividend.

119.    Its financial performance confirms this fact.  On July 27, 2010, BP announced that during the first half of 2010 net cash provided by operating activities totaled $14.4 billion, and

that it held $7.3 billion in cash and cash equivalents as of June 30, 2010.  For the first half of the year BP disclosed a loss of about $11.1 billion that reflected a pre-tax charge of more than $32 billion related to the oil spill, including a charge of $20 billion related to the escrow announced by BP following its June 16, 2010, meeting with President Obama.

120.    On November 2, 2010, BP announced a third quarter profit of nearly $1.8 billion, and for the first nine months of the year BP disclosed a loss of less than $9.3 billion despite a pre-tax charge of $39.9 billion related to the oil spill.

121.    On February 1, 2011, BP announced a fourth quarter profit of more than $5.5 billion, and for the full year in 2010, BP disclosed a loss of less than $3.8 billion despite a pre-tax charge of $40.9 billion related to the oil spill. BP also announced that its board of directors had declared a quarterly dividend in respect of the fourth quarter of 2010 in the amount of $0.07 per ordinary share and $0.42 per ADS payable on March 28, 2011.

## SUMMARY OF ADS SHAREHOLDERS' RIGHT TO DIVIDEND

122.    As alleged above, Plaintiff and other ADS shareholders are entitled to payment of the 2010 first quarter dividend for the following reasons, among others:

   a.  The dividend was irrevocable because it was declared by BP's directors pursuant to their authority under Article 131(B);

   b.  Article 131(B) was a non-standard article adopted by BP as part of BP's express decision to opt-out of the default rules under the Companies Act 2006;

   c.  Article 131(B) gave BP's directors (as opposed to the Company, through its shareholders) the express right to declare and pay dividends;

   d.  If Article 131(B) gave no additional authority to the directors than they already possessed under Article 132 (which authorized the directors to pay

interim dividends), then there would have been no reason for BP to amend its Articles of Association in 2003 to include this non-standard article;

e. Indeed, BP's directors told BP's shareholders that Article 131(B) was a substantive amendment intended to broaden the powers of the directors to declare and pay dividends;

f. Under well-established English law, a company's articles may give directors the authority to declare dividends, and dividends declared by the directors pursuant to such authority may not be cancelled;

g. Under well-established English law, dividends may be declared annually or in respect of any interim period;

h. In this light, it is more plausible to conclude that BP's director's have been acting pursuant to their authority to declare dividends under Article 131(B), than to conclude that BP's directors have since 2003 undertaken to pay an endless stream of interim dividends under Article 132 without any notice to shareholders, prospective investors, or the exchanges that such dividends may be cancelled and revoked at the absolute and complete discretion of BP's directors at any time before, on, or after the record date;

i. BP's actions in declaring the dividend in U.S. dollars, announcing a date on which the Sterling equivalent would be announced and the determination of the equivalent, are consistent only with respect to dividends declared pursuant to Article 131;

j.  As a company listed on the NYSE, as well as the LSE, BP fulfilled its NYSE listing requirements by amending its articles to include Article 143 – Record Date;

k.  According to the NYSE Listing Company Manual, the record date is to be the date on which there are no remaining contingencies as to the payment of the dividend, *i.e.*, the date on which payment of the dividend is assured;

l.  Since 2003, BP has never indicated that there was any contingency as to the payment of any dividend;

m.  Article 143, by its plain language, applies to both interim and declared dividends as well as any other distribution to any holder of any BP security;

n.  Article 143 applies to record dates for dividends that are "recommended, resolved, declared or announced";

o.  Article 143 states that it applies "notwithstanding any other provision" of BP's Articles of Association;

p.  Article 143 fixes BP's obligations regarding dividends as of the record date elected by the directors, providing that shareholders as of the record date "***shall be entitled***" to payment of any "recommended, resolved, declared or announced" dividend (emphasis added); and

q.  Fixing the irrevocability of a dividend as of the record date is not only consistent with NYSE listing requirements, it is also logical and plausible since shareholders who sell after the record date receive less for their shares because the buyer will not be entitled to the dividend.  Accordingly, if dividends for companies listed on the NYSE could be revoked at will after the

47

record date, neither sellers nor buyers would be able to fashion a fair price in light of the uncertainty of whether payment might be revoked and when.

## BP'S LEGAL OBLIGATIONS

123.    BP retained and did not pay the first quarter dividend as it was legally obligated to do on June 21, 2010.

124.    Applicable law and BP's Articles of Association did not authorize or permit BP's directors to cancel the properly declared first quarter dividend.

125.    Applicable law and BP's Articles of Association did not authorize or permit BP's directors to not pay when due the properly declared first quarter dividend.

126.    In other words, BP had a legal obligation to pay the dividend and no public relations issue will excuse a debtor from paying its creditors.

## FIRST CLAIM FOR RELIEF
### (Assumpsit)

127.    Plaintiff incorporates the allegations set forth above as though fully set forth herein.

128.    On April 27, 2010, BP announced the declaration of a lawful dividend payable on June 21, 2010, to BP ADS shareholders of record as of May 7, 2010.

129.    The declaration of the dividend and record date created an immediate binding obligation on the part of BP to pay the dividend on June 21, 2010, to plaintiff and all other BP ADS shareholders as of the record date, and a corresponding right on the part of plaintiff and all other BP ADS shareholders on the record date to enforce such obligation and receive the dividend.

130.     The rights of plaintiff and the other members of the Class with respect to the dividend were fixed, ascertained, and accrued as of the record date, and BP could not thereafter rescind, cancel, or modify the dividend or its obligations with respect thereto.

131.     BP retained and did not pay the declared dividend to plaintiff and the other members of the Class.

132.     Based on the foregoing allegations, plaintiff and the other members of the Class are entitled to receive the unpaid dividend and prejudgment interest thereon.

## SECOND CLAIM FOR RELIEF
### (Money Had and Received)

133.     Plaintiff incorporates the allegations set forth above as though fully set forth herein.

134.     On April 27, 2010, BP announced the declaration of a lawful dividend payable on June 21, 2010, to BP ADS shareholders of record as of May 7, 2010.

135.     The declaration of the dividend and record date created an immediate binding obligation on the part of BP to pay the dividend on June 21, 2010, to plaintiff and all other BP ADS shareholders as of the record date, and a corresponding right on the part of plaintiff and all other BP ADS shareholders as of the record date to enforce such obligation and receive the dividend.

136.     The rights of plaintiff and the other members of the Class with respect to the dividend were fixed, ascertained, and accrued as of the record date, and BP could not thereafter rescind, cancel, or modify the dividend or its obligations with respect thereto.

137.     BP retained and did not pay the declared dividend to plaintiff and the other members of the Class.

138.    Plaintiff, for himself and the other members of the Class, claims the unpaid dividend retained by BP and prejudgment interest thereon.

139.    Based on the foregoing allegations, BP, in equity and good conscience, is not entitled to retain the unpaid dividend or any interest thereon.

### THIRD CLAIM FOR RELIEF
### (Unjust Enrichment)

140.    Plaintiff incorporates the allegations set forth above as though fully set forth herein.

141.    On April 27, 2010, BP announced the declaration of a lawful dividend payable on June 21, 2010, to holders of BP ADS shareholders of record as of May 7, 2010.

142.    The declaration of the dividend and record date created an immediate binding obligation on the part of BP to pay the dividend on June 21, 2010, to plaintiff and all other BP ADS shareholders as of the record date, and a corresponding right on the part of plaintiff and all other BP ADS shareholders as of the record date to enforce such obligation and receive the dividend.

143.    The rights of plaintiff and the other members of the Class with respect to the dividend were fixed, ascertained, and accrued as of the record date, and BP could not thereafter rescind, cancel, or modify the dividend or its obligations with respect thereto.

144.    BP retained and did not pay the declared dividend to plaintiff and the other members of the Class.  Consequently, BP received, and was at all material times aware that it received, a benefit in the amount of the unpaid dividend, plus interest thereon.

145.    Plaintiff, for himself and the other members of the Class, claims the unpaid dividend retained by BP and prejudgment interest thereon.

146.     Based on the foregoing allegations, it would be unjust to allow BP to retain the unpaid dividend or any prejudgment interest thereon.

### FOURTH CLAIM FOR RELIEF
**(Breach of Contract)**

147.     Plaintiff incorporates the allegations set forth above as though fully set forth herein.

148.     On April 27, 2010, BP announced the declaration of a lawful dividend payable on June 21, 2010, to BP ADS shareholders of record as of the record date.

149.     The declaration of the dividend and record date created an immediate binding contract on the part of BP to pay the dividend on June 21, 2010, to plaintiff and all other BP ADS shareholders as of the record date, and a corresponding right on the part of plaintiff and all other BP ADS shareholders as of the record date to enforce such contract and receive the dividend.

150.     The dividend was fixed, ascertained, and accrued and therefore due and payable to plaintiff and the other members of the Class as of the record date, and BP could not thereafter cancel or modify the dividend or its obligations with respect thereto.

151.     BP breached the contract to pay the declared dividend by not paying the declared dividend.  In addition, BP breached the contract to pay the declared dividend by breaching the covenant of good faith and fair dealing implied in all contracts by seeking to cancel the declared dividend and by not paying the declared dividend.

152.     As a result of BP's breach of contract, plaintiff and the Class suffered damages of $0.84 per ADS share outstanding as of the record date, plus prejudgment interest thereon.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.     On its First Claim for Relief, an order requiring BP to pay the declared dividend of $0.84 per ADS to plaintiff and each of the other members of the Class, plus interest from June 21, 2010;

B.     On its Second Claim for Relief, an order requiring BP to pay the declared dividend of $0.84 per ADS to plaintiff and each of the other members of the Class, plus interest from June 21, 2010;

C.     On its Third Claim for Relief, an order requiring BP to pay the declared dividend of $0.84 per ADS to plaintiff and each of the other members of the Class, plus interest from June 21, 2010;

D.     On its Fourth Claim for Relief, an order awarding plaintiff and the other members of the Class damages in an amount equal to the declared dividend of $0.84 per ADS, plus interest from June 21, 2010;

E.     An order designating the case as a class action pursuant to the Federal Rule of Civil Procedure 23;

F.     An order appointing plaintiff and his counsel to represent the Class;

G.     An order awarding costs and disbursements; and

H.     All such further and other relief, including equitable relief, as the Court deems just and equitable.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.


Dated:  November 21, 2013
.

                         KLAFTER OLSEN & LESSER LLP


By:_____
          Seth R. Lesser
Two International Drive, Suite 350
Rye Brook, NY 10573
Tel: (914) 934.9200
Fax: (914) 934-9220


STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
Steve D. Larson*
Keith A. Ketterling*
Jennifer S. Wagner*
Jacob S. Gill*
209 S.W. Oak Street, Fifth Floor
Portland, Oregon 97204
Telephone:    (503) 227-1600
Facsimile:    (503) 227-6840

*Attorneys for Plaintiff*


*To apply for admission *pro hac vice*

53